The next matter on our calendar is Susanna Murkin and others v. XOOM Energy, LLC Good morning, counsel. I said good morning, counsel. Good morning, Your Honor. Burkitt McInturff on behalf of Susanna and Boris Murkin and the proposed class. May it please the court, this is a simple breach of contract case. The defendant's contract requires that their energy rates be based on the defendant's supply costs. That's not their only basis, but it is the basis to start the calculation. Is that your argument? No, Your Honor. That is the only basis. The contract says it's based Do they have other things that they say will enter into the cost of the energy? No, Your Honor. The contract says, and I'm pointing to page 12 in our opening brief, the customer's monthly variable rate is based on XOOM's actual and estimated supply costs, which may include but not be limited to prior period adjustments, inventory, and balancing costs. So it's confined to the defendant's supply costs. Whatever balancing costs are, that doesn't seem like it's a scientific term. Balancing costs are actually included in the wholesale cost of energy when you purchase energy. What is a balancing cost? A balancing cost is one of many subcategories of costs that are incorporated in the wholesale rate. So the rate that is published and that an energy company such as XOOM pays to purchase energy is composed of dozens of components. Most of those components are regulated costs and regulated components, and a balancing cost is one of those components. Are they allowed to include their profit, which they're allowed to achieve? Aren't they allowed a margin over and above these costs? Again, Your Honor, we're not taking the position that they're not allowed a margin. We're taking the position that their rates have to be tied to their supply costs, which is what their contract Tied to but not identical. Isn't that what your argument is? No, Your Honor, our argument, tied to but not identical, they must reflect their costs. These companies are very lean businesses. They're essentially brokers and traders. They have very low overhead. They buy on the wholesale market, and they resale to consumers. So the wholesale The ultimate price to the consumer has to have some relationship to their supply costs. Correct. And instead not evidence essentially price gouging margins that are well in excess of the underlying costs. Why isn't this case decided by direct energy? This, as Your Honor dissented, this case is the opposite of direct energy. In direct energy, the contract said that the defendant's prices were to be based on business and market conditions. The court said, well, there's significant leeway in here. The plaintiffs in that case were trying to tie the company's rates to its supply costs. That was their main argument. This is the opposite. The company has bound its costs, has bound its rates to its supply costs. So we don't have the same problem that the plaintiffs had in direct energy where the court was able to say, Well, there's these myriad of factors. There's many things that can go into how the defendant sets rates. In direct energy, the practices that were challenged there are indicative of the practices of this industry as a whole. And as pointed out by the Public Service Commission staff recently, this is a billion dollar fraud that's being perpetrated on New York consumers. Consumers can't compare their prices. They can't tell that they're getting overcharged. And the energy companies like defendants here, they know it, and they're charging much higher rates than what they're paying for energy. And consumers are stuck. The idea of allowing this kind of industry was a consumer protection idea so that there would be negotiation, so that there would be competition for the rate payer. So how did it go so wrong? Well, as the PSC staff has found, the industry has taken proactive steps to obscure their pricing. It's not like when you drive around and you purchase gas, you can look and see how much the gas is charging. This is something that is built to you constantly as you use your energy. It comes a month later, and it's very difficult to compare prices, which is why companies like Zoom make representations that their prices are going to be tied to their costs. They can get market share that way. You haven't had discovery yet, so you don't know exactly the relationship between their costs and the prices they charge. That is true, but we have a very good idea because Zoom purchases on the wholesale market. This is simply a wholesaler. They buy on the wholesale market, and they— You know the price they pay. We basically know the price. We don't know the exact price. We don't know all of their supply costs. But, again, they're very lean operations. They don't have a lot of staff. They certainly don't deliver or bill or generate. They do, actually. They're brokers. They're brokers, and companies like Zoom, they even outsource their marketing. They call me all the time, these people. They want me to change my supplier. They do that so they have a marketing— Well, not necessarily, Your Honor. Many of the marketing components are outsourced. But, again, this is a product you sign up once. As Your Honor pointed out in Your Honor's dissent in the Richards case, maybe you do some diligence the first month. You sign up the first month, but they trick you there. They give you a teaser rate. So the month that you sign up where you're doing diligence, you're on a teaser rate, and then the next months come, and they raise your rate and raise your rate and raise your rate, and all of a sudden you're paying sometimes 30%, 40%, 50% more than you would have paid your utility for the same energy. It's the same stuff. There's no difference. And here the defendants have tied their contract, their prices, to their underlying supply costs. We allege in the complaint, which must be taken as true, and we show based on wholesale prices that the defendants' costs don't resemble their supply costs. In fact, they're taking 40%, 50%, 60% margins compared to what they're paying on wholesale. That's not what you would pay with Con Ed or any other utility. And here the contract requires that the defendants' rates be based on their supply costs. Let me ask you this. Your time is running out, but why do you believe your implied covenant claim is viable? Your Honor, the district court dismissed the implied covenant claim as duplicative of the contract claim. We decided not to challenge the implied covenant claim. So at this point it's just breach of contract. So it's not unjust enrichment and it's not implied? Those two claims were removed from the proposed amended complaint because they were dismissed. The judge's ruling that those claims were duplicative of the contract claim are not the subject of our appeal. What is it that you propose to include in your amended complaint that the court below rejected? Well, the court below faulted us for the perceived faults that the court found was that we didn't disclose our calculations because it's a complaint, but we disclosed our calculations so that the court could see how the various components added up and didn't equal anywhere near what the price of Zoom was charging. The court also found that we didn't specify as clearly as the court would have liked that Zoom purchases on the wholesale market, which is key because if Zoom says our rates are going to be based on our costs, it's a fair point to say, well, what are your costs? Well, we found proof that Zoom is a participant in New York's regulated wholesale energy market, and so we're able to determine their costs, and when you line up their costs for energy alongside the rates they charge, it doesn't add up. And it's consistent with a pattern of behavior that has harmed New York consumers to the tune of billions of dollars. In this case, it's just one of the many consumer protection actions that are trying to bring some oversight to this industry and protect New York consumers, and we should have been allowed and should be allowed to proceed to discovery. Thank you. Are you here arguing the sufficiency of your first complaint or your amended complaint? Both, Your Honor. The first complaint, we believe, was sufficient. It's a simple breach of contract case. The defendant's contract says its prices are based on it. Whether it's simple or not, I'm a little surprised you're even invoking the first complaint. If you've got a second complaint in the record and that's the one that is limited to the breach of contract and drops the others, I would have thought you were here on the second complaint. We're here on both because we're at the pleading stage, Your Honor, and we pled what Zoom's- Why do you want the first one, which has three causes of action, two of which you just told us you dropped? So why should we look at something, most of which is gone? What's in the first that's not in the second? Fair enough. If we have to stand on one complaint, we would stand on the second complaint. The district court referred to an allegation of wholesale costs being 90% of total costs. That's correct. Is that in the second complaint? Yes, Your Honor. Can you tell me? Do you have a hand or can you help me find which paragraph? Yes, Your Honor, I can. I thought it was there. I just don't see it as I look. Well, anyway, you're satisfied it's in there somewhere? Yes, Your Honor. If you'd like, we can submit a letter- No, wait a minute. If you say it's in there- It's definitely in there. A term search would- All right. Now, you keep talking about their supply costs, but in fact, your second complaint refers specifically to the fact that the supply costs were based on their cost in the wholesale market. That's correct. They buy on the wholesale market. So, again, they- That's why I don't understand. Well, your first complaint does talk about supply, but if your theory is they promise that the price to the consumer would vary according to the wholesale price, then why not just say that? Why do you then sort of use the more general term, supply, because they could get supply theoretically on the retail market. They could go to another retailer. Well, Your Honor, the contract bases prices on the defendant's, quote, supply costs, and we know, as we allege in the complaint, that they buy wholesale. So they don't buy from another retailer, and we allege, and it must be taken as truth, they buy wholesale. They pay the wholesale price. And so we know, based on our experience in the industry, that that's essentially all they do is they buy wholesale. That's what we allege. That's what we allege that is 90% of their cost. The class allegations have nothing to do with any issue before us now. That's fair to say, Your Honor. If we find the second complaint is sufficient, it will be up to the district judge to decide in the first instance the class issue. That's correct, Your Honor. We were dismissed on the pleadings. We've had no discovery. We haven't been permitted to show that the prerequisites of Rule 23 have been met. You deserve two minutes for rebuttal. Thank you, Your Honor. We'll hear from Zoom. May it please the court. My name is David Cott. I am the attorney for the defendant's appellees. Here's what the contract says, and it's on page A94 of the appendix. 94. A94 of the appendix. The first paragraph of the contract says that the customer's variable market rate will be, quote, and balancing costs, close quote. That's the contract provision we're dealing with on this appeal. And when you look at either the plaintiff's initial complaint or the plaintiff's proposed amended complaint, it has no allegations about the estimated costs of Zoom. Well, if you're . . . But the prices you actually charge, it seems to me, can't be divined or can't be matched up with what you say you're going to do. You say that it's based on the actual and estimated costs. Would you agree that you're dealing with a commodity and you are essentially a commodity broker? Yeah, I think I would agree with that, Judge Prado. All right. So we start off in the . . . you have this teaser rate. And, you know, the next month you're charging $1,250 and the market is $1,189. Then two months later, you're 50 percent over the market rate. The next month you're 45 percent over the rate. By October, you're 60 percent over the rate. I have a tough time understanding how in a commodities business where . . . I mean, you want improving on . . . electricity is electricity. It's not even like you're selling better electricity or anything like that. It seems to me you're just simply taking a wholesale rate and tacking on a tremendous write-up, which, hard to believe, reflects any additional value you add or anything you do. Couple. And so it seems to me, once I look at this chart, that your representations aren't what you're really doing. And you may be able to win, but this is just at a pleading stage. A couple of responses to that, Judge. Please. First, the market rate the court just referred to is a market rate calculated by the plaintiffs, unrelated to the costs set forth in the contract that I just quoted. Related to the wholesale cost. Not their market rate. They put in the market rate, and that's what Judge Parker just asked me. They put in the market rate, and when they put in the elements of the market rate, which is what the court just asked me, comparing the market rate, that's their market rate, that has elements that aren't found anywhere in the contract. That's the first thing. Second thing, the contract allows us to charge estimated costs. But if you're any kind of business people, the estimated costs should track the real costs, only be a lagging indicator. Correct? Isn't that what you try to do, estimate accurately? Of course. But we're in an industry where you sometimes can get spikes in prices. You can get the polar vortex where the energy soars because everybody is very shivering in their home. That's all for trial. Maybe you're going to show that, in fact, your rate did vary according to the wholesale rate because it spiked, it went down. You may win. But right now you've got a contract that says supply costs, and they've alleged your rate didn't vary with supply costs, that, in fact, the wholesale rate was 90% of your supply costs, and it didn't vary with that. Right, and I think we're back, Judge Newman, to Iqbal and Twombly. They've alleged 90% in conclusory terms. Yeah, I was curious about that. The district court said that. It said the statement that more than 90% of defendant's supply costs come from its purchase of wholesale energy. What's conclusory about that? Because they have no basis that our supply costs, meaning Zoom's, are 90%. That's why they want discovery, counsel. Judge Pooley, that's why I said I think this is an Iqbal and Twombly, because in Iqbal and Twombly the Supreme Court was clear you must set forth a plausible cause of action, not based on speculation, based on actual facts. What is the conclusion? What's conclusory as distinguished from factual when you say more than 90% come from the purchase of wholesale energy? Which word or phrase is a naked conclusion? The 90% because it's not tethered. That's not specific enough? 90%? It's not tethered to the contract. The contract says we can take into account . . . It's tethered to the word supply. That's in the contract, supply costs. Right. And that's the very same sentence. 90% of defendant's supply costs come from its purchase of wholesale energy. Right. So, again, where's the conclusory statement? I would submit that the entire sentence that the court, Judge Newman, you just read to me is conclusory. There's nothing tied there to the words of the contract, which means estimated supply costs and which includes prior period . . . If they had said more than 90% of defendant's actual and estimated supply costs, then it wouldn't have been conclusory? Taking into account other factors such as prior period adjustments . . . They don't have to recite the whole contract every time they make an allegation. Well, I don't . . . And the district court here, in her first motion to dismiss, order granting the motion to dismiss, was very clear and gave a road map to the plaintiffs as to what the court thought was insufficiently pled under Iqbal and Twombly. They didn't even use the word wholesale the first time. Right. So, they now come back and they say, all right, Judge, you faulted us for not talking about wholesale. We'll talk about wholesale. And, we won't just say it's in there somewhere. We'll say 90% of it is wholesale. Right. You don't think that's specific? No, I don't think under Iqbal and Twombly, because it's not tethered to the words of the contract. They don't explain where they get 90%. The conclusory is saying the Attorney General did something wrong. Yeah, I . . . That's Iqbal. Yeah, I do think it's just as . . . I think the lesson of Iqbal and Twombly, and I know Your Honors deal with it more than I do, you deal with it every day, is you don't get to say . . . And, the plaintiffs have done this. If you look at page A83 of the appendix, in paragraph 58 of their proposed amended complaint, they talk about if we could get additional discovery, we could prove. If you look at plaintiff's reply brief at page 18, plaintiff's opening brief at page 16, it talks about . . . And, I'm going to be very general. Yeah, if we can get some more discovery, we can fill in the holes that we have in our complaint. You know, you keep invoking Iqbal and Twombly. What seems to me to be plausibly alleged in this complaint is that you use a teaser rate. You say it's going to . . . that the rates going forward are going to be based on supply costs. And, that's qualified with . . . may include, but not limited, prior period adjustments, inventory, balancing costs, and so forth. And, what you're doing here is, as soon as the teaser rate is expired, you're jacking these rates way up, hoping that people who are your customers aren't going to be sophisticated enough to decode their utility bill . . . This wild variation, upward variation, in the price of something that's essentially a commodity, which you buy as a broker in a commodities market. Seems misleading to me. I don't mean misleading to me, but it seems to me that is essentially what they're alleging. And, I see nothing implausible about that. They may be wrong. They may not be able to prove it, but it certainly seems plausible to me. Judge Parker, I think that ignores, right in the first page of the contract, right in the middle, where the contract states to the customer, we do not guarantee savings. In the first page of the contract, under the term, the contract, the customer can end this contract, either in writing or by calling a toll-free number. In fact, we know this customer, Mr. Merkin. He's price sensitive. He's paying attention. He's paying attention. He . . . Cancel eliminates the possibility that you've breached your contract? Not at all. I'm simply responding to Judge Parker's question that the consumer doesn't know. And, essentially, we take advantage of the consumer by the teaser rate. Here, we have a price sensitive customer. We know that because of his other class action brought by the same attorneys when he bought energy like we did for Viridian. You think you have a price sensitive class? I hadn't anticipated that question because class issues aren't here, Your Honor. I will confess I had not thought about that. I'll withdraw it. But on this record, for who's in the class, the people in the class would be people who would have received this contract, which says, number one, we don't guarantee any savings. And, number two, you can leave whenever you want. Just pick up the phone and dial an 800 number. Well, I appreciate you don't guarantee a saving because the wholesale price may go way up, in which case the consumer price is going to go way up. I get that. But isn't the customer entitled to think, as the wholesale price varies since it's 90 percent of your price, then my cost is going to vary? No. That's not a fair inference? No, because we have prior period adjustments. There might be adjustments that come in that affect that. This customer was only with us for about five months. We have balancing costs, and we may have other costs. Even though this is 90 percent of the price? Well, again, I had the colloquy earlier with the court on my view on whether 90 percent is a conclusory allegation or not. 90 percent, you call it conclusory. Whether it's conclusory or not, it's still 90 percent, which is a lot. Right. But it doesn't Does the consumer then think that my price is going to vary substantially with wholesale costs? On this contract, I don't think the consumer can have that expectation. I do not think the consumer can have Supposing, in fact, it was 98 percent. Would the consumer then be entitled to think, well, if wholesale costs vary, my costs are going to vary? And we may be talking about a different contract. A lot of the cases I'm just wondering if your problem is that 90 is too low a number, or you don't like the whole concept of putting a percentage on it. I don't like the concept. Let me back up. You're not really quarreling with 90. Well, there's nothing in this record that supports 90 percent other than Of course there's not, because they haven't had a trial. They've pled 90 percent. So to tell me there's nothing in the record on a motion to dismiss is If you'll forgive me, a bit disingenuous that there's nothing in the record. And I might have been overbroad. There's nothing that supports the allegation of 90 percent in the record. You could do it from other energy companies. You could get the information from energy. Why should you do that at the pleading stage if you've said 90 percent? Because I think under my reading of the case law, that's what's required. Okay. Thank you. Thank you. We thank the court. You have reserved two minutes for rebuttal. Yes, Your Honor. Just briefly, to Your Honor's prior question about the 90 percent allegation, that's on page A64 of the appendix. 64? Yes, Your Honor. It's paragraph 4 in the proposed amended complaint. Yes. And just briefly to address the defendant's point about prior period adjustments, the charts that we put in the complaint show that the wholesale costs during the relevant period are quite stable. And essentially what the defendants are asking that the court do at the time where wholesale prices were very, very high and that they were very positive, the spikes were both high and positive and they were prolonged. And that's simply a question of fact at this stage of the litigation that can't be answered. And we believe that we've met Twombly and Eggball. We've plausibly alleged that they're a wholesale market participant. There's publicly available data about their participation in the wholesale markets. We're able to calculate the wholesale price for this plaintiff during their exact billing cycles. And when you compare the two, the prices that they paid for wholesale . . . that the defendants paid for wholesale energy compared to what the consumer paid, it simply doesn't add up. It's the prices that the defendants are charging are not connected to their wholesale costs and we have therefore alleged a breach of contract. Are you familiar . . . You were the attorney for the Merkins in their previous case against Viridian? I was one of the attorneys, Your Honor. You mentioned that the staff of the Public Service Commission has now said this is a billion-dollar scam. What do you propose as a solution, re-regulation or not? Well, Your Honor, if it was up to me. But what is currently proceeding in the Public Service Commission is the Merkins filed their first case against Viridian Energy in 2014. Late at the end of 2014, the Public Service Commission announced a reset of the market where they were deciding to hold a hearing whether to evaluate whether all ESCOs could be prohibited from providing variable rate products unless they guaranteed to beat the utility. And that proceeding last summer proceeded to . . . They guaranteed what? To beat the utility. So basically, you had to guarantee savings. You have to make money under that. I mean, the consumer would have to save money. Correct. That was the only way they would permit an ESCO like the defendant's to charge a variable energy rate. What happened? So the hearing has occurred, but the industry challenged the PSC's authority . . . I'm not surprised. . . . to issue the regulation. And in May of this year, the New York Court of Appeals upheld the PSC's authority to hold the hearing, but the results of the hearing have not occurred. But that's pending. That is pending, Your Honor. They may change this whole industry. Hopefully, Your Honor. Thank you. Are you familiar with the Erickson case the Supreme Court decided after Iqbal?  You might want to look. It always interests me that plaintiffs . . . I understand the problem. You're confronted with Iqbal and Twombly, and so everybody says whether or not it meets Iqbal and Twombly. But within two weeks of those cases, they reversed the district court for throwing out a complaint, a very short complaint, short, concise, according to the rule, and they reinstated it. So I understand why plaintiffs don't say we are sufficient under the Twombly-Iqbal-Erickson rule, which gets the full sequence. I'll read it on the train, Your Honor. Thank you, counsel. Thank you both. Likely discussion. Thank you all. We deserve a decision.